**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **RICK WILLETS**, individually and on behalf of all others similarly situated;<br><br>*Plaintiff,*<br><br>v.<br><br>**SYSCO CORPORATION**,<br><br>*Defendant.* | Case No.: 4:26-cv-4926<br><br>**COMPLAINT-CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Rick Willets ("Plaintiff"), individually and on behalf of all others similarly situated, sues Sysco Corporation ("Sysco" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. For his Class Action Complaint and Jury Demand, Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of his counsel, and the facts that are a matter of public record.

### I.     INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII" or "Private Information") of Plaintiff and other current and former employees of Defendant, the putative class members ("Class Members").

2. In or around June 2026, the cybercriminal group known as ShinyHunters publicly claimed responsibility for infiltrating Defendant's Salesforce environment and exfiltrating more than sixty-one million records containing customer, employee, and other internal corporate data,

including the Private Information of Plaintiff and the Class Members.[1] This Private Information included but is not limited to names, addresses, dates of birth, Social Security numbers, and other sensitive personal identifying information.

3.      The Data Breach resulted from Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted for employment or other business relationships.

4.      Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information was subjected to unauthorized access by cybercriminals and precisely what type of information was accessed.

5.      Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

6.      Defendant, through its employees, disregarded the rights of Plaintiff and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendant also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class

---

[1] *See* ShinyHunters Claims 61M Sysco Records Weeks After Qilin Ransomware Threat, Cybernews, available at: https://cybernews.com/news/sysco-shinyhunters-61-million-salesforce-records/ (last visited June 22, 2026).

Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

7.    In addition, Defendant's employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant's employees (presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

8.    Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

9.    Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10.    Because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

11.    Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

13. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

14. Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, and (iii) unjust enrichment.

## II.    PARTIES

15. Plaintiff Rick Willets is and at all times mentioned herein was an individual citizen of Montana, residing in the city of Billings. Plaintiff is a victim of the Data Breach.

16. Plaintiff provided Defendant with his sensitive PII as a condition of his employment with Defendant.

17. Defendant is a Delaware corporation maintaining its principal place of business at 1390 Enclave Parkway, Houston, Texas 77077. Defendant may be served with process through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## III.    JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the Class, and at least one member of the Class is a citizen of a State different from Defendant, including Plaintiff.

4

19.    This Court has personal jurisdiction over Defendant because Defendant regularly conducts and solicits business in this District and throughout the United States, Defendant has purposefully availed itself of the privileges of conducting business activities within this District, and the wrongful conduct giving rise to this action occurred in substantial part within this District.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant has caused harm to Plaintiff and Class Members residing in this District.

## IV.    FACTUAL ALLEGATIONS

*Defendant's Business*

21.    Sysco is the world's largest food distribution company. Founded in 1969, Sysco operates more than 340 distribution facilities worldwide, supplying nearly 500 fresh and frozen food products, culinary supplies, and restaurant equipment to roughly 750,000 customer locations across 10 countries.[2] Sysco's network serves customers across the healthcare, government, travel, education, and retail sectors, and the company employs tens of thousands of people in the ordinary course of its business.

22.    As part of its business operations, Sysco employs current and former employees, including Plaintiff, and maintains their Private Information, including names, addresses, dates of birth, Social Security numbers, and other sensitive personal information, in its computer systems and Salesforce environment.

---

[2] *See* ShinyHunters Claims 61M Sysco Records Weeks After Qilin Ransomware Threat, Cybernews, available at: https://cybernews.com/news/sysco-shinyhunters-61-million-salesforce-records/ (last visited June 22, 2026).

23.     In the ordinary course of doing business with Defendant, each employee must provide (and Plaintiff did provide) Defendant with sensitive, personal, and private information, such as his or her:

- address;
- telephone number;
- date of birth;
- Social Security number;
- driver's license number;
- driver's license state;
- financial account information;

24.     Defendant agreed to and undertook legal duties to maintain the protected personal information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws.

25.     The employee information held by Defendant in its computer system and network included the Private Information of Plaintiff and Class Members.

***The Data Breach***

26.     A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

27.     In Texas, "breach of the security of the system" means "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive personal information maintained by a person, including data that is encrypted if the person accessing the data has the key required to decrypt the idea."

28.     Likewise, "Personal information" means: any information, including sensitive data, that is linked or reasonably linked to an identified or identifiable individual.

29.     The State of Texas requires that any "person who conducts business in this state and owns or licenses computerized data that includes sensitive personal information shall disclose

any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Tex. Bus. & Com. Code Ann. § 521.053(b). In fact, "breach of a security system" is defined as "[the] unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive personal information." Tex. Bus. & Com. Code Ann. § 521.053(a).

30.    Plaintiff and the proposed Class Members provided their Private Information to Defendant as a condition of employment. Defendant stored Plaintiff's and the Class Members' Private Information on its computer systems and servers.

31.    Unfortunately, Defendant failed to take adequate measures to protect its current and former employees' Private Information stored on its computer servers, including failing to implement reasonable cybersecurity safeguards or policies to protect Private Information, and failing to supervise its information technology or data security agents and employees, or vendors, to prevent, detect, and stop breaches of its systems.

32.  As a direct result of Defendant's failures, cybercriminals operating as ShinyHunters gained unauthorized access to Defendant's Salesforce environment and exfiltrated data belonging to Defendant's customers, employees, and others, including Plaintiff and the Class Members.[3] ShinyHunters has publicly claimed to have exfiltrated more than sixty-one million records from Defendant's systems.[4] The information accessed and exfiltrated likely included at least full names,

---

[4] *See* ShinyHunters Claims Sysco Breached, Salesforce Records Exposed, BreachNews, available at: https://breachnews.com/breaches/sysco-allegedly-breached-as-shinyhunters-claims-61-million-salesforce-records/ (last visited June 22, 2026).

7

addresses, dates of birth, Social Security numbers, and other highly sensitive Private Information of Plaintiff and the Class Members.[5]

33.  To date, Defendant has not disclosed the identity of the cybercriminals who perpetrated the Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, the full scope of Private Information accessed, or the remedial measures, if any, undertaken to ensure such a breach does not occur again. These details remain unexplained and unclarified to Plaintiff and the Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

34.  Defendant's silence amounts to no disclosure at all, as it has failed to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

35.  Despite Defendant's intentional silence and refusal to confirm or clarify the scope of the Data Breach, several facts may be gleaned from public reporting on the incident, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals infiltrated Defendant's networks and systems and downloaded data from those systems (aka exfiltrated data, or in layperson's terms "stole" data); and c) that once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Social Security numbers, PII, and other sensitive information for download and theft.

36.  Defendant has failed to specify whether it has undertaken any efforts to contact Plaintiff and the Class Members whose Private Information was accessed and acquired in the Data Breach to inquire whether any of them have suffered misuse of their data, whether they should report such

---

[5] *See* ShinyHunters Claims 61M Sysco Records Weeks After Qilin Ransomware Threat, Cybernews, available at: https://cybernews.com/news/sysco-shinyhunters-61-million-salesforce-records/ (last visited June 22, 2026).

misuse to Defendant, or whether Defendant has set up any mechanism for Class Members to report misuse of their Private Information.

37. Based on the nature of the cyberattack, Plaintiff's and the members of the proposed Class Members' Private Information, unauthorizedly disclosed to third-party cybercriminals in the Data Breach, is currently available on the dark web for public viewing and use, in the public domain, to be sold and utilized for fraudulent and criminal misuse.

38. Defendant had obligations created by contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

39. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

40. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep Plaintiff's and Class Members' PII safe and confidential.

41. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

42. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

43. In 2024, a record 3,158 data breaches occurred, resulting in around 1,350,835,988

individuals' information being compromised, a 211% increase from 2023.[6] Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

44.    Data thieves regularly target institutions like Defendant due to the highly sensitive information in its custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

45.    The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[7]

46.    As a result of the Data Breach, its victims face a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like their Social Security numbers. Accordingly, Defendant's failure to offer any credit monitoring or identity theft protection services to Plaintiff and the Class Members is wholly insufficient to compensate them for their damages resulting from the Data Breach.

47.    Defendant's failure to offer any credit monitoring services to Plaintiff and the Class Members, despite public reporting confirming the scope of the Data Breach, supports the reasonable belief that Plaintiff's and the Class Members' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

---

[6] *See* Identity Theft Resource Center, *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited February 11, 2026).
[7]    IBM, *Cost of a Data Breach 2022: A Million-Dollar Race to Detect and Respond*," https://www.ibm.com/reports/data-breach (last visited February 11, 2026).

*Data Breaches Are Preventable*

48.   Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

49.   Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

50.   As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[8]

51.   To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

---

[8] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[9]

52.   To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

-       Apply latest security updates

-       Use threat and vulnerability management

-       Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

---

[9] *Id.* at 3-4.

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities

- Hunt for brute force attempts

- Monitor for cleanup of Event Logs

- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall

- Enable tamper protection

- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[10]

53.    Given that Defendant was storing the Private Information of its current and former employees, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

54.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach

---

[10] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

***Plaintiff's Experience***

55.    Plaintiff Rick Willets was an employee of Sysco prior to and at the time of the Data Breach.

56.    As a condition of employment with Defendant, Plaintiff was required to provide his Private Information to Defendant, including his name, contact information, date of birth, Social Security number, payment/financial account information, and other Private Information.

57.    At the time of the Data Breach, Plaintiff was a former employee of Defendant, and Defendant maintained Plaintiff's Private Information in its systems.

58.    Plaintiff is very careful about sharing his sensitive Private Information. He stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

59.    Plaintiff learned of the Data Breach through public reporting on the ShinyHunters extortion claim, not from any notice provided by Defendant. As of the filing of this Complaint, Defendant has not directly notified Plaintiff that his Private Information was accessed, acquired, or exfiltrated in the Data Breach, despite public claims that Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties.

60.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—valuable time he otherwise would have

spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

61. At the instant his Private Information was accessed by cybercriminals without his consent or authorization, he suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

62. Plaintiff is at an increased risk of unwanted calls, texts, and/or emails following the Data Breach. Criminals routinely target data breach victims with unsolicited and deceptive communications designed to gain access to victims' devices, elicit additional personal information, or facilitate identity theft and fraud. This risk is made possible by cybercriminals' ability to leverage compromised data -- such as the names, Social Security numbers, dates of birth, and financial account information exposed in this Data Breach -- to locate additional identifying information about individuals, including phone numbers and email addresses, through publicly available sources and data aggregation websites that associate personal information with specific individuals. Plaintiff therefore faces a heightened and concrete risk of such communications as a direct and proximate result of the Data Breach.

63. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has, to date, never directly notified him of the Data Breach and has still not informed him of key details about the Data Breach's occurrence, leaving him to learn of the compromise of his Private Information through public reporting on the cybercriminals' own claims.

64. Plaintiff's Private Information, exfiltrated in the Data Breach, is currently available on the dark web, exposing Plaintiff to actual, present harm.

65. As a result of the Data Breach, Plaintiff has already spent time and incurred out-of-pocket costs and anticipates spending in the future considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

66. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for his lifetime.

67. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

68. Defendant's conduct resulted in the unauthorized disclosure of Plaintiff's Private Information to cybercriminals. The unauthorized disclosure of his Private Information constitutes an invasion of a legally protected privacy interest, that is traceable to Defendant's failure to adequately secure the Private Information in its custody, and has resulted in actual, particularized, and concrete harm to him. The injuries he suffered, as described herein, can be redressed by a favorable decision in this matter.

69. Defendant's conduct, as evidenced by the circumstances of the Data Breach, creates an imminent risk of future identity theft, fraud, or other forms of exploitation.

16

70.    More specifically, the exposure to the Data Breach caused him to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach.

71.    Plaintiff's mitigation measures were not a self-inflicted harm, as these actions were taken after the Data Breach occurred but before Defendant provided him with any meaningful explanation of the Data Breach, which has not happened to date as described herein.

72.    Plaintiff has a continuing interest in ensuring that his Private Information is kept confidential and protected from disclosure, and he should be entitled to injunctive and other equitable relief.

***Value of Private Information***

73.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[11] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[12]

---

[11] 17 C.F.R. § 248.201 (2013).
[12] *Id.*

74.  The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[13]

75.  For example, Personal Information can be sold at a price ranging from $40 to $200.[14] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[15]

76.  Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

77.  It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

---

[13] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[14] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[15] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

78.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

79.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

80.    Defendant knew or should have known of the risks and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### *Defendant Failed to Comply with FTC Guidelines*

81.    The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

82.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[16] The guidelines also recommend that businesses use an intrusion detection system to

---

[16] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited February 11, 2026).

19

expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[17]

83. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

84. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

85. Defendant failed to properly implement basic data security practices.

86. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to current and former employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

87. Defendant was always fully aware of its obligation to protect the PII of its current and former employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

---

[17] *Id.*

20

*Defendant Failed to Comply with Industry Standards*

88.    Experts studying cybersecurity routinely identify institutions that store PII like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

89.    Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

90.    Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

91.    Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

92.    As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

93.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and

21

RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

94.    Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***The Data Breach Caused Plaintiff and the Class Members Injury and Damages***

95.    Plaintiff and members of the proposed Class have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendant, that has occurred, is ongoing, and/or will imminently occur.

96.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

97.    Data Breaches such as the one experienced by Defendant's employees are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

98.    As stated prior, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiff's and the proposed Class Members' Private Information, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

99.    Once an individual's Private Information is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised data to gather and steal even more information.[18]

---

[18]   Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited February 11, 2026).

100. The ramifications of Defendant's failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

101. Because Defendant failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a.    The loss of privacy and the opportunity to control how Private Information is used;

b.    Unauthorized use of stolen Private Information;

c.    Dramatic increase in spam telephone calls;

d.    Emotional distress and anxiety;

e.    The compromise and continuing publication of their Private Information;

f.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h.    The diminution in value of their Private Information;

i.    Delay in receipt of tax refund monies; and,

j.    The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

*The Data Breach Caused Plaintiff and the Class Members Increased Risk of Identity Theft*

102.  Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

103.  Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' PII falling into the hands of identity thieves.

104.  The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

105.  Further, the standard operating procedure for cybercriminals is to use some data, like the PII here, to access "Fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.

106.  With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

107.  The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it

24

at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

108. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

109. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[19]

110. Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

111. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank

---

[19] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited February 11, 2026).

25

accounts, credit cards, driving records, tax and employment histories and other private information increases." [20] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[21]

112. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[22]

113.  In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[23] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[24]

114.  Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

---

[20] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[21] *Id.*
[22]  Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[23] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[24] *See* https://www.investopedia.com/terms/s/ssn.asp

115. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.  Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

116.  It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

117.  Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

118. The California state government warns patients that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[26]

---

[25] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*:   http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft
[26] *See* https://oag.ca.gov/idtheft/facts/your-ssn

27

119. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: "For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated."

120. What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII are valuable property rights.

121. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

122. Where the most PII belonging to Plaintiff and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

123. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO Report, at p. 29.

28

124. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

125. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

126. To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has offered no credit monitoring services whatsoever, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

127. Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and strengthened its data systems accordingly.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

128. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

129. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

130. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports

29

could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

131. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

132. By spending this time, data breach Plaintiff was not manufacturing his own harm, he was taking necessary steps at Defendant's direction and because the Data Breach included his Social Security number.

133. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

134. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[27]

***Diminution in Value of Private Information***

135. PII is a valuable property right.[28] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences.

---

[27] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[28] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

136.  An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[29]

137.  In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[30]

138.  Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[31]

139.  As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

140.  Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

---

[29] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited February 11, 2026).
[30] https://datacoup.com/ (last visited February 11, 2026).
[31]      Nielsen      Computer      &      Mobile      Panel,      Frequently      Asked      Questions,
https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited February 11, 2026).

141.  Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

142.  Given the risks to Plaintiff and the Class Members, the future cost of credit and identity theft monitoring is both reasonable and necessary.

143.  The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Plaintiff and the Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

## V.    **DEFENDANT'S BREACH**

144.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

   b.  Failing to adequately protect employees' Private Information;

   c.  Failing to properly monitor its own data security systems for existing intrusions;

   d.  Failing to store files containing sensitive data in an encrypted state;

   e.  Failing to train employees in the proper handling of emails containing malicious software, and to maintain adequate email security practices;

   f.  Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

   g.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

32

h.  Failing to adhere to industry standards for cybersecurity.

145.  As the result of computer systems needing security upgrading, inadequate procedures for securing its cloud-based customer relationship management environment, and inadequately trained or supervised personnel responsible for configuring and monitoring access to that environment, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

146.  Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## VI.  PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

147.  To date, Defendant has done nothing to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach.

148.  Defendant has wholly failed to compensate Plaintiffs and Class Members, which is inadequate given that victims commonly face multiple years of ongoing identity theft, and it provides no compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

149.  Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

150.  Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

151.  Plaintiff was damaged in that his Private Information is in the hands of cyber criminals.

152.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

153.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

154.  Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, and similar identity theft.

155.  Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

156.  Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

157.  Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

158.  Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

159.   Plaintiff and Class Members have suffered or will suffer actual injury as a result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.  Finding fraudulent charges;

    b.  Canceling and reissuing credit and debit cards;

c.   Purchasing credit monitoring and identity theft prevention;

d.   Addressing their inability to withdraw funds linked to compromised accounts;

e.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.   Placing "freezes" and "alerts" with credit reporting agencies;

g.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.   Contacting financial institutions and closing or modifying financial accounts;

i.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.   Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

160.   Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

161.   Further, because of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

162.   As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII.    CLASS ACTION ALLEGATIONS

163.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

164. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated.

165. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All persons whose Private Information was compromised because of the Data Breach identified in 2026 (the "Class").**

166. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

167. Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number and identities of Class Members are unknown to Plaintiff at this time, as such information is in the sole possession of Defendant and ascertainable through its records.

168. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

    b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i. Whether Defendant's conduct was negligent;

j. Whether Defendant's conduct was *per se* negligent;

k. Whether Defendant was unjustly enriched;

l. Whether Defendant failed to provide notice of the Data Breach promptly; and

m. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

169. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

170. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

171. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

172. <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

173. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

174. Likewise, issues that will arise in this case are appropriate for class certification because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

   a.   Whether Defendant failed to timely notify the public of the Data Breach;

b.  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.  Whether Defendant's security measures to protect its data systems were reasonable considering best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

175.  Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach.

## VIII.  <u>CAUSES OF ACTION</u>

**FIRST COUNT**
**NEGLIGENCE**
**(On Behalf of Plaintiff and All Class Members)**

176.  Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

177.  Defendant required Plaintiff and Class Members to submit non-public personal information to obtain employment and do other business with them.

178.  By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

179. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

180. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class, which is recognized by laws and regulations including but not limited to the Federal Trade Commission Act, as well as common law. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining employment and doing business with Defendant.

181. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

182. Defendant also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(a) "to implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by [Defendant] in the regular course of business."

183. Defendant also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(b) to destroy any Private Information that was no longer necessary for it to maintain.

184. Defendant further had a duty to use reasonable care in protecting confidential data because Defendant is bound by industry standards to protect confidential Private Information.

185.   Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.   Failing to adequately monitor the security of its networks and systems;

c.   Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d.   Allowing unauthorized access to Class Members' Private Information;

e.   Failing to detect timely that Class Members' Private Information had been compromised; and

f.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

186.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

187.   It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

188.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

189.   Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

190.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to

41

future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and All Class Members)**

191.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

192.    When Plaintiff and Class Members provided their Private Information to Defendant in exchange for employment with Defendant, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

193.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

194.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including the Federal Trade Commission Act, Texas statutes, and adhered to industry standards.

195.    Plaintiff and Class Members provided resources to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

196.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

197.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

198.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

199.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

200.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

201.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

202.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## THIRD COUNT
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

203. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

204.  Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

205.  Upon information and belief, Defendant funds its data security measures entirely from its general revenue.

206.  As such, a portion of the revenue attributable to Plaintiff's and Class Members' labor is to be used to provide a reasonable level of data security, and the portion of those revenues that is allocated to data security is known to Defendant.

207. Plaintiff and Class Members conferred a monetary benefit on Defendant. They provided labor and engaged in business with Defendant and in so doing provided Defendant with

their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the services that were the subject of the transaction and appropriate protection for their Private Information.

208. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

209. Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

210. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

211. Defendant failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

212. Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

213. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

214. Defendant benefitted from collecting and using Plaintiff's and Class Members' sensitive Private Information for business purposes. Yet Defendant failed to bear the costs of safeguarding that same information, instead shifting the risk of harm to the individuals who entrusted their PII.

215. Plaintiff and Class Members conferred a direct and valuable benefit on Defendant by providing their sensitive PII, which Defendant accepted and used in the operation of its business. Because Defendant failed to provide reasonable data protections in exchange, equity and good conscience dictate that Defendant should not be allowed to retain the benefit without providing adequate safeguards.

216. Plaintiff and Class Members gave Defendant their sensitive personal data, a valuable asset in its own right, which Defendant used to further its business operations while cutting costs on security. Defendant's retention of this benefit without adequate protection is inequitable.

217. Plaintiff and Class Members have no adequate remedy at law.

218. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

a. actual identity theft;

b. the loss of the opportunity of how their Private Information is used;

c. the compromise, publication, and/or theft of their Private Information;

d. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e. lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f. the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant

45

fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g.  future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

219.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

220.  Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, the economic value and profits they unjustly received from the labor provided by Plaintiff and Class Members. In the alternative, Defendant should be compelled to pay restitution in an amount equal to the fair market value of the services rendered for which Defendant failed to provide lawful compensation.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class described above seeks the following relief:

a.  For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and his counsel to represent the Class, and finding that Plaintiff is a proper representative of the Class requested herein;

b.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.  For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e.  For an Order directing Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.   For an award of punitive damages, as allowable by law;

h.   For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.   Pre- and post-judgment interest on any amounts awarded; and

j.   Any other relief that this court may deem just and proper.

## X.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

DATED: June 22, 2026                              Respectfully submitted,

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery
Texas Bar No. 24052214
lmontgomery@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931

**COUNSEL FOR PLAINTIFF AND THE PROPOSED CLASS**